IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ANTOINETTE LEVITT, et al.**,<br><br>Plaintiffs,<br><br>*v.*<br><br>**UNITED STATES**,<br><br>Defendant. | **CIVIL ACTION**<br><br>**NO. 20-5455** |

**MEMORANDUM**

**MARSTON, J.**                                                                                               February 22, 2022

Plaintiff Antoinette Levitt was leading a tour through Independence National Historical Park (the "Park"), when she allegedly tripped on a loose brick, fell, and sustained injuries. (Doc. No. 1 ¶ 1.) On November 2, 2020, Mrs. Levitt, together with her husband, Plaintiff Robert Levitt, brought negligence and tortious interference claims against the United States under the Federal Tort Claims Act ("FTCA"), alleging that the United States (acting by and through the National Park Service)[1] negligently inspected and maintained the Park's brick walkways and negligently failed to warn the Park's visitors of the dangers posed by brick walkways. (*Id.*) Presently before the Court is the Government's motion to dismiss for lack of subject matter jurisdiction. (Doc. No. 19.) For the reasons below, the Government's motion is granted.[2]

---

[1] The Complaint originally named as Defendants the National Park Service and the Park, but the parties stipulated to amend the caption "to correctly name the United States of America as the sole Defendant." (Doc. No. 17)

[2] The parties requested oral argument; however, pursuant to Local Rule 7.3(f), "[t]he court may dispose of a motion without oral argument."

1

**I.       FACTUAL BACKGROUND**

   **A.       *Mrs. Levitt's Fall***

On May 26, 2018, Mrs. Levitt was guiding a tour through Philadelphia's Old City neighborhood and passed by Christ Church, a historic property at the northwest corner of Second and Market Streets.  (Doc. No. 1 ¶ 1.)  As she made her way along a brick walkway near the church, she tripped over a loose brick and fell, causing her to fracture her left hand and experience swelling and bruising on her head and face.  (*Id.* ¶¶ 11, 17.)  She has had to undergo multiple surgeries and attend physical therapy, and she continues to suffer from post-traumatic stress, anxiety and depression, sleeplessness, and various other "ills and injuries."  (*Id.* ¶¶ 17–18.)  The accident has also deprived Mr. Levitt of his wife's "love, companionship, comfort, affection, society, moral guidance, intellectual strength, and physical assistance."  (*Id.* ¶ 27.)

   **B.       *Independence National Historical Park***

Christ Church and the surrounding areas lie within the Park.  (*Id.* ¶ 9.)  The Park is administered and regulated by the National Park Service, a bureau within the Department of the Interior charged with conserving natural and historic objects.  (Doc. No. 19 at 4.)  Congress created the Park in 1948 to "preserv[e] for the benefit of the American people . . . historical structures and properties of outstanding national significance located in Philadelphia, Pennsylvania, and associated with the American Revolution and the founding and growth of the United States."  16 U.S.C.A. § 407m.  The Park spans "approximately 55 acres on 20 city blocks within Philadelphia" and "is home to iconic symbols of democracy as Independence Hall and the Liberty Bell."  (Doc. No. 19, Ex. A, ¶ 4.)  It contains 56 properties (many of which date back to the 18th century) and "more than 13 miles of sidewalks and paved trails . . . , nearly all of which are stone or brick."  (*Id.* ¶ 5.)  The stone and brick walkways are important features to maintain

the Park's "historic and cultural character." (*Id.*)

The Park has 50 "direct labor" maintenance employees who attend to maintenance issues at the Park's buildings, grounds, and walkways; however, the maintenance department rarely operates at full staff due to retirement and personnel turnover. (*Id.* ¶ 6.) The Park employs two masons who are responsible for maintaining the stone and brickwork throughout the Park. (*Id.* ¶ 7.) The Park's annual, non-labor maintenance budget is $710,000, but the Park's annual, non-labor maintenance costs regularly exceed $1,000,000, requiring the Park to reallocate funds as possible. (*Id.* ¶ 6.) Park employees are directed to report any maintenance issues they observe, and the maintenance team attempts to respond to those issues and any hazards visitors may report in a timely manner. (*Id.* ¶ 8.)

## II.   LEGAL STANDARD

### A. *Motion to Dismiss for Lack of Subject Matter Jurisdiction*

A motion to dismiss pursuant to Rule 12(b)(1) may present either a facial or a factual attack to the court's subject matter jurisdiction over the case. *CNA v. United States*, 535 F.3d 132, 139 (3d Cir. 2008). A facial attack challenges the sufficiency of the pleadings. *Id.* Where a motion to dismiss is construed as a facial attack, "the court must consider the allegations of the complaint as true" and dismiss a case where the pleadings fail to allege that the case is within the court's subject matter jurisdiction. *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). In contrast, a factual attack challenges the factual basis of the court's jurisdiction. *CNA*, 535 F.3d at 139. Where a motion to dismiss is construed as a factual attack, the plaintiffs bear the burden of proving subject matter jurisdiction, and "no presumption of truthfulness attaches to the allegations of the plaintiffs." *Id.* In considering such a motion, the court is permitted to "make factual findings which are decisive to the issue." *Id.*

Here, the Government "presents a factual challenge to jurisdiction," (Doc. No. 19 at 11), so the Court is permitted to make factual findings on the question of jurisdiction, *see CNA*, 535 F.3d at 139.

### B.     Federal Tort Claims Act

"The United States of America, as a sovereign, is immune from suit unless it consents to be sued." *Merando v. United States*, 517 F.3d 160, 164 (3d Cir. 2008) (citing *United States v. Mitchell*, 445 U.S. 535, 538 (1980)). Through the FTCA, Congress has abrogated the United States' immunity and permits suits against the Government "for money damages . . . for personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. 1346(b)(1). This waiver of immunity is not without bounds. It does not apply to

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a).

The purpose of this exception, the "discretionary function exception," is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984).

Courts must conduct a two-step inquiry to determine whether the challenged conduct falls within the discretionary function exception. *United States v. Gaubert*, 499 U.S. 315, 322–24 (1991). "First, a court must determine whether the act giving rise to the alleged injury and thus

the suit involved an element of judgment or choice." *S.R.P. ex rel. Abunabba v. United States*, 676 F.3d 329, 333 (3d Cir. 2012) (citing *Gaubert*, 499 U.S. at 322). If so, a court moves to the second prong of the inquiry and must "determine whether the challenged action or inaction is of the kind that the discretionary function was designed to shield." *S.R.P.*, 676 F.3d at 333. "[T]he exception protects only governmental actions and decisions based on considerations of public policy." *Gaubert*, 499 U.S. at 323 (cleaned up). "The focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Id.* at 325.

Although plaintiffs bear the burden of establishing that their claim falls within the FTCA, the Government bears the burden of establishing that the challenged conduct falls within the discretionary function exception. *S.R.P.*, 676 F.3d at 333.

### III. ANALYSIS

Before engaging in the two-step inquiry, we must identify the challenged conduct. *Id.* Plaintiffs allege that the Park negligently failed to maintain its brick walkways, inspect its brick walkways, and warn its visitors of the dangers of traversing brick walkways. (Doc. No. 1 ¶ 23.) Thus, the challenged conduct is the Park's judgment regarding whether and how to maintain and inspect its brick walkways and whether to warn visitors of the risks associated with travelling over such walkways.

#### A. *The Challenged Conduct Was Discretionary*

The first prong of the two-step inquiry requires the court to consider whether the challenged conduct "involved an element of judgment or choice." *S.R.P.*, 676 F.3d at 333. If a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," the discretionary function exception does not apply because "the employee has no

5

rightful option but to adhere to the directive." *Berkovitz ex rel. Berkovitz v. United States*, 486 U.S. 531, 536 (1988). The Government argues that the challenged conduct is discretionary because no "statute, regulation or policy . . . restricts the discretion of the Park or its employees in making maintenance and safety decisions," and no statute "mandated the actions that [Plaintiffs] assert[] were warranted." (Doc. No. 19 at 13.) Plaintiffs disagree and assert that the Park was subject to "an affirmative mandate, through statutes and internal policies, to conduct a program of preventative and rehabilitative maintenance." (Doc. No. 20-1 at 14.)

Various statutes, regulations, and internal policies give the National Park Service discretion on how to best maintain and inspect its parks and on whether and how to warn visitors of potential risks. The National Park Service is charged with regulating its parks "by means and measures that conform to [its] fundamental purpose [of] conserv[ing] the scenery, natural and historic objects, and wild life . . . ." 54 U.S.C.A. § 100101(a). "To implement this statutory directive, the [National Park Service] has adopted various policies and internal operating procedures, including those related to public safety." *S.R.P.*, 676 F.3d at 334–35.

The National Park Service's 2006 Management Policies[3] "do not impose park-specific visitor safety prescriptions." Nat'l Park Serv., *Management Policies 2006*, at 115, available at https://www.nps.gov/orgs/1548/upload/ManagementPolicies2006.pdf. Rather, the Management Policies grant each park's superintendent the discretion to address safety concerns:

> The Service will strive to identify and prevent injuries from recognizable threats to the safety and health of persons and to the protection of property . . . . When practicable and consistent with congressionally designated purposes and mandates, the Service will reduce or remove known hazards and apply other appropriate measures, including closures, guarding, signing, or other forms of education. . . .

---

[3] Both parties agree that the 2006 Management Policies were in effect in May 2018, when Mrs. Levitt fell. (*See* Doc. No. 19 at 15; Doc. No. 20 at 14.)

> *The means by which public safety concerns are to be addressed is left to the discretion of superintendents and other decision-makers at the park level who must work within the limits of funding and staffing.* Examples include decisions about whether to install warning signs or artificial lighting, distribute weather warnings or advisories, initiate search-and-rescue operations or render emergency aid, eliminate potentially dangerous animals, close roads and trails or install guardrails and fences, and grant or deny backcountry or climbing permits. . . .

*Id.* The Management Policies also require each park to conduct "a regular, periodic inventory of its facilities" to ensure the facilities are being maintained in the most cost-effective way and to conduct "a program of preventative . . . maintenance . . . to provide a safe . . . environment for park visitors and employees." *Id.* at 138.

With respect to Independence National Historic Park specifically, the Secretary of the Interior is authorized, "*in his discretion*" to "maintain [the Park] . . . in such manner as he shall consider to be in the public interest." 16 U.S.C.A. § 407s (emphasis added). Although there is no written policy, the Park manages its walkways in line with the Management Policies' general directives, and its maintenance plan "balance[s] the interest of visitor safety within the constraints imposed by the Park's congressionally-mandated mission, NPS policy, and budget limitations."[4] (Doc. No. 19, Ex. A, ¶ 10.)

In sum, the policies require the Park "to strike a balance between" preservation of the Park's historic nature and public safety, but they ultimately leave the decision of how to strike that balance to the Superintendent's discretion. *See S.R.P.*, 676 F.3d at 335. Nowhere do the

---

[4] Plaintiffs point the Court to the opinion in *Borlandoe v. United States*, 86 F. Supp. 2d 493 (E.D. Pa. 2000), which states that the Park had a policy that "if a brick is raised by ¼ inch, that condition requires a report to be made and the defect to be repaired as soon as possible." *Id.* at 494. This opinion is over 20 years old, and the Park's current superintendent was not familiar with that policy and was not able to identify any record memorializing such policy. (Doc. No. 19, Ex. A, ¶ 11.) Plaintiffs have not identified any evidence that any such policy was in effect on the date of Mrs. Levitt's fall.

7

relevant statutes, regulations, or policies "specifically dictate" how the Park's personnel are to inspect and maintain the Park's walkways or post signage warning of the dangers of walking on brick.  *Id.*  This is exactly the kind of guidance that the Third Circuit and other district courts within this Circuit have found "involved an element of judgment or choice."

For instance, in *S.R.P.*, the plaintiff, a minor child, was bitten by a barracuda while visiting Buck Island, an island near the U.S. Virgin Islands that is maintained by the National Park Service.  *Id.* at 330.  The plaintiff brought suit against the National Park Service under the FTCA, alleging that it acted negligently by failing to post signage warning visitors of the presence of barracudas in the water.  *Id.*  Analyzing the exact same statutory provision and nearly identical Management Policies, the Third Circuit found that the governing policies "[did] not specifically dictate the way in which park officials should balance these concerns [i.e., preservation and public safety] or the specific actions that must be taken in response to particular problems."  *Id.*  Because "no statute, regulation, or policy mandated any particular method for warning about marine hazards at Buck Island," the panel found that the challenged conduct "involved an element of judgment or choice."  *Id.* at 335–36.

Similarly, in *Whitaker v. United States*, CIVIL ACTION No. 19-4993, 2020 WL 6504551, (E.D. Pa. Nov. 5, 2020), the plaintiff tripped over a crack in a trail at Valley Forge National Park and brought suit against the National Park Service under the FTCA, alleging the Service "negligently failed to maintain the trail in a safe condition."  *Id.* at *1.  The court analyzed substantially the same policies that govern here and found that the relevant policies "[did] not dictate a specific manner in which park officials should identify or respond to any safety concerns."  *Id.* at *3.  Because those polices "leave[] the means of identifying and mitigating public safety concerns to the discretion of the superintendent," the court held that

"inspection and maintenance of park trails involves an element of judgment or choice." *Id.* at *4; *see also Merando v. United States*, 517 F.3d 160, 172 (3d Cir. 2008) (concluding that the park's failure to properly address hazardous trees involved an element of judgment because the relevant policies "did not mandate any particular methods of hazardous tree management"); *Lingua v. United States*, 801 F. Supp. 3d 320, 327 (M.D. Pa. 2011) (holding that the park's trail management safety measures were discretionary because the relevant policies provided "no specifically prescribed course of action regarding the employment of safety measures"); *Miller v. United States*, 642 F. Supp. 2d 437, 442 (M.D. Pa. 2009) (concluding that the park's superintendent's decision not to place a warning sign near a drainage ditch was discretionary).

So too here. The policies clearly leave the Park's decisions on how to inspect and maintain walkways and whether to post warning signs to the Superintendent's discretion. Nevertheless, Plaintiffs argue that the policy requiring parks to conduct inspections and engage in preventative maintenance is not discretionary because it *requires* inspections and preventative maintenance. (Doc. No. 20 at 14–15.) This argument is unavailing. Even though the Management Policies require such conduct, they offer no tailored guidance on how to engage in that conduct. Instead, the policies explicitly leave decisions about public safety matters (including park maintenance and inspection and the decision whether to post warning signage) to the "discretion" of the Park's Superintendent who must "work within the limits of funding and staffing." Nat'l Park Serv., *Management Policies 2006*, at 115. The plaintiffs in *Whitaker* made a similar argument, which the court rejected, explaining that the policy "unambiguously leaves the means of identifying and mitigating public safety concerns to the discretion of the superintendent" by requiring the superintendent to "mitigate risks 'within the limits of available resources.'" *Whitaker*, 2020 WL 6504551, at *4.

Accordingly, the Government has shown that the Park's inspection and maintenance practices and decision not to post warning signage "involved an element of judgment or choice."

### B.  *The Challenged Conduct Is Susceptible to Policy Analysis*

The Court must now consider whether the challenged conduct "is of the kind that the discretionary function was designed to shield." *S.R.P.*, 676 F.3d at 333. "When established governmental policy, as expressed or implied by statute, regulation, or agency guidelines, allows a Government agent to exercise discretion, it must be presumed that the agent's acts are grounded in policy when exercising that discretion." *Gaubert*, 499 U.S. at 324. Despite this presumption, the Government "must establish that the challenged conduct is 'grounded in the policy of the regulatory regime,' and 'based on the purposes that the . . . regime seeks to accomplish.'" *S.R.P.*, 676 F.3d at 336 (quoting *Gaubert*, 499 U.S. at 325 & n.7). That is, "there must be a rational nexus between the Government's decision and social, economic, and political concerns." *Id.*

As discussed above, the National Park Service's Management Policies allow the Park to exercise discretion with respect to the challenged conduct, so the challenged conduct is presumptively grounded in policy, and the Third Circuit and district courts have held that conduct similar to that challenged here (including decisions on how to inspect and maintain trails and whether to post warning signs) is susceptible to policy analysis.

For instance, in *Merando*, the Third Circuit explained that the National Park Service's decision "to expend the bulk of its resources on high-visitor use areas" was a policy decision driven, in part, by the fact that the park "[knew] it could not inspect every tree in the Parks." 517 F.3d at 174; *see also Whitaker*, 2020 WL 6504551, at *5 (explaining that a park's method of inspecting trails by having park staff observe trail conditions and report hazards they may come

10

upon was the result of a decision regarding "how best to utilize its resources to balance the interests of public safety and conservation" and concluding that such decisions are "susceptible to policy analysis").  Similarly, here, given budgetary and personnel restrictions, it was not feasible for the Government to check every single brick on the 13 miles of brick walkways throughout the Park.  They made a policy decision to have Park staff informally inspect the grounds as they moved through the Park and to address maintenance issues as Park staff and visitors reported them.

      Further, in *S.R.P.*, the Third Circuit explained that the decision not to post signage warning of the risk of a barracuda attack was susceptible to policy analysis because the National Park Service had to balance the benefit of such a warning with costs, such as the "risk of numbing [the Park's] visitors to all warnings."  676 F.3d at 337; *see also Miller*, 642 F. Supp. 2d at 443 (concluding that the park's decision not to place a warning sign near a drainage ditch was susceptible to policy analysis).  Likewise, here, the Park had to engage in the same kind of cost–benefit analysis in determining whether to post a sign warning visitors of the risks of walking on brick.  The Park's decision not to post warning signs was a policy decision impacted by competing considerations, including public safety on the one hand and budgetary restraints, the need to maintain the Park's historic aesthetic, and the desire not to overload the Park's visitors with too many warnings on the other.

      These judgments are exactly the kinds of policy decisions the discretionary function exception is intended to keep parties from second-guessing.  *S.R.P.*, 676 F.3d at 337.

*   *   *

      Because the Park's decisions regarding how to inspect and maintain the brick walkways and whether to warn visitors of the risks associated with walking on brick paths involved an

element of judgment or choice and are susceptible to policy analysis, the discretionary function exception applies, and the Court lacks subject matter jurisdiction.

## IV. CONCLUSION

For the reasons above, the Government's motion to dismiss is granted. An appropriate Order follows.